## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
## CLARKSBURG

**ANN RENEE WILSON**

      **Plaintiff,**

v.                                         **Civil Action No.: 1:10-CV-65**
                                                  **JUDGE KEELEY**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

      **Defendant.**

## REPORT AND RECOMMENDATION TO THE DISTRICT JUDGE RECOMMENDING THAT THE DISTRICT COURT GRANT DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [10], DENY PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [8], AND AFFIRM THE RULING OF THE COMMISSIONER

## I.  INTRODUCTION

On April 22, 2010, the Plaintiff, Ann Renee Wilson ("Plaintiff"), by counsel Susan Kipp McLaughlin, Esq., filed a complaint in this Court to obtain judicial review of the final decision of the Defendant, Michael J. Astrue, Commissioner of Social Security ("Commissioner" or "Defendant"), pursuant to Section 205(g) of the Social Security Act, as amended 42 U.S.C. § 405(g). (Complaint, ECF No. 1)  On November 12, 2010, the Commissioner, by counsel Helen Campbell Altmeyer, Assistant United States Attorney, filed an answer and the administrative record of the proceedings.  (Answer, ECF No. 4; Social Security Administrative Record, ECF No. 5)  On December 13, 2010, and January 11, 2011, the Plaintiff and the Commissioner filed their respective motions for summary judgment.  (Pl.'s Mot. for Summ. J., ECF No. 8; Def.'s Mot. for Summ. J., ECF No. 10)  Following review of the motions by the parties and the administrative record, the

undersigned Magistrate Judge now issues this Report and Recommendation to the District Judge, recommending that the District Court **GRANT** the Defendant's motion, **DENY** the Plaintiff's motion, and **AFFIRM** the ruling of the Commissioner.

## II. BACKGROUND

### A.    Procedural History

On July 25, 2006, the Plaintiff filed an application for a period of disability and disability insurance benefits, alleging disability beginning June 17, 2006.[1] (R. at 7, 123-25) Her claim was initially denied on October 6, 2006, and denied again upon reconsideration on January 10, 2007.[2] (R. at 7, 103, 104) On January 24, 2007, she filed a timely written request for a hearing, which was held before a United States Administrative Law Judge ("ALJ") on March 27, 2008, in Morgantown, West Virginia. (R. at 7, 46-102, 114) On April 30, 2008, the ALJ issued an unfavorable decision to the Plaintiff, finding that she was not disabled within the meaning of the Social Security Act. (R. at 4-15) On May 5, 2008, the Plaintiff filed a request with the Appeals Council for review of the ALJ decision. (R. at 26) The Appeals Council denied her request for review on February 20, 2010, making the ALJ's decision the final decision of the Commissioner. (R. at 1-3) The plaintiff now requests review of the ALJ decision denying her application for disability.

---

[1] The ALJ's decision references July 25, 2006, as the date that the Plaintiff filed her claim. (R. at 7) However, Plaintiff's application, listed as Exhibit 1D in the administrative record, is listed in the transcript index as dated July 30, 2006, and the application itself has a header with a date of July 31, 2006. (R. at 123-25)

[2] The ALJ's decision references October 6, 2006, as the date that the Plaintiff's claim was initially denied, and January 10, 2007, as the date that her claim was denied upon reconsideration. (R. at 7) However, the initial and reconsideration disability determination transmittals, listed as Exhibits 1A and 2A in the administrative record, list dates of October 3, 2006, and January 9, 2007. (R. at 103-04)

**B.** **Personal History**

The Plaintiff, Ann Renee Wilson, was born on November 16, 1966, and was 40 years old at the time she initially applied for disability insurance benefits. (R. at 123) She is a high school graduate, and although she has not had any post-secondary training she has prior work experience as a caterer. (R. at 61, 63) She is currently married to Craig Wilson and has a ten-year-old daughter. (R. at 49, 60, 123-24)

**C.** **Medical History**

**1.** Evidence Predating The Alleged Onset Date

The Plaintiff's medical history begins with reconstructive knee surgery in 1989, followed by a total left knee replacement on October 20, 2003.[3] (R. at 203) Following this knee replacement surgery, the Plaintiff suffered from persistent recurrent effusions in her knee that produced pain and swelling. Id.

On May 5, 2004, the Plaintiff visited United Hospital Center in Clarksburg, West Virginia, for x-rays of her left knee. (R. at 343-344) Four views of the left knee showed no change in the appearance of her prosthesis, and although no specific abnormality was detected the examining physician felt that a large joint effusion was present. (R. at 344)

On May 27, 2004, the Plaintiff visited Dr. David L. Waxman, M.D., an orthopedic surgeon, for a consultation concerning pain and swelling in her left knee. (R. at 235-37) At that time, Dr. Waxman noted that her left knee had 3+ effusion, was mildly warm to touch, and had +5 degrees

---

[3] The record does not contain medical reports from these procedures, but they are referenced in the ALJ's opinion, the Plaintiff's testimony, and Dr. Waxman's medical history summary. (See R. at 13, 68-69, 203-04) The ALJ reported that Dr. Waxman performed the knee replacement surgery in 2003; however, Dr. Waxman's notes state that the Plaintiff's initial treating surgeon was Dr. Lefebure. (R. at 204)

extension to 135 degrees flexion.  Id.  After reviewing her medical history and x-rays taken during the consultation, Dr. Waxman told the Plaintiff that her knee was not infected, that the replacement components from the original surgery were well positioned, and that the pain and swelling she was experiencing was possibly due to the rotational position of the components.  (R. at 235)  Dr. Waxman recommended the Plaintiff continue walking, begin taking anti-inflammatory medicines, and visit Dr. Blaha for a second consultation.  Id.

The Plaintiff was evaluated on June 28, 2004, by Dr. J. David Blaha, M.D., of the West Virginia University ("WVU") Department of Orthopaedics.  (R. at 494-95)  Dr. Blaha determined that the Plaintiff's left knee revealed an excellent range of motion, with 0 to 160 degrees of motion. Id.  She was stable to varus and valgus stresses.  Id.  No warmth or erythema was noted about her incision, which appeared to be well healed.  Id.  The right knee showed tenderness to palpation over the patellar ligament and the distal pole of the patella, but she had no ligamentous laxity.  Id.  Dr. Blaha opined that the Plaintiff had an appropriate treatment performed on her knee, but in light of her subjective complaints of pain and instability, and after ruling out the possibility of infection as a cause of those complaints, he believed that the Plaintiff should consider having a revision surgery performed to implement a different prosthesis.  Id.

On August 20, 2004, the Plaintiff visited Dr. Waxman for a pre-surgical consultation.  (R. at 231, 234)[4]  The Plaintiff was described by Dr. Waxman as walking with "almost a lurch and a stiff left leg."  (R. at 234)  Her left knee had 2+ effusion, was tender medial, anterior, and lateral, and had

_____

[4] Dr. Waxman's treatment notes appear to be out of order in the record.  Page 231 appears to be the remainder of Dr. Waxman's report dated August 20, 2004, due to the discussion of a pre-surgery MRI and other details relating to the symptoms reported by the Plaintiff to Dr. Waxman on that date.

0-130 degrees flexion-extension. Id. Her right knee had no effusion, no tenderness medial, was tender anterior and lateral, and had +5 degrees extension to 135 degrees flexion. Id. X-rays showed the original knee replacement components to be in excellent position and alignment without obvious problems; however, Dr. Waxman believed that the Plaintiff would benefit from replacing these components with a different design. Id.

On September 1, 2004, Dr. Waxman performed a revision left knee replacement to replace the tibial and femoral components of the Plaintiff's artificial knee. (R. at 203) Dr. Waxman reported that by the second day the Plaintiff was walking 500 feet, the range of motion in her knee was 5 to 80 degrees, and that her incision was dry, closed, and open to the air. Id. On September 3, 2004, she was cleared to go home, and discharged with prescriptions for Lortab 7.5 and Bextra 20 milligram for pain. Id.

On September 27, 2004, the Plaintiff visited Dr. Waxman for a followup on her left knee replacement surgery. (R. at 229-30) Dr. Waxman reported that the Plaintiff's incision was healing fine without problem. Id. X-rays showed that the previous knee components were replaced exactly with the revision components, and that the Plaintiff's patella tracked nicely with just a little bit of lateral tilt as was present previously. Id. Her left knee had 0-105 degrees range of motion, and 2+ effusion. Id. Overall, Dr. Waxman felt that she was doing very well four weeks after the surgery. Id. Dr. Waxman recommended that she cut back on her Bextra medication but continue to take Lortab 7.5 mg while recovering, and referred her to outpatient physical therapy for range of motion and strengthening.[5] (R. at 229-30)

_____

[5] The Plaintiff was previously referred by Dr. Lefebure for physical therapy at Healthworks Rehab and Fitness in Buckhannon, West Virginia, and she continued to receive physical therapy there after referral from Dr. Waxman. (R. at 239-319) The Plaintiff was

On October 6, 2004, the Plaintiff visited Dr. Norihito Onishi, D.O., of Tri-County Health Clinic, for a physical examination and followup on her blood work. (R. at 397) Dr. Onishi noted that the Plaintiff's left knee showed some mild swelling. Id.

On October 28, 2004, the Plaintiff visited Dr. Waxman for an eight-week post-surgery checkup on her revised left knee replacement. (R. at 228) Dr. Waxman noted 1-2+ effusion of her left knee, and a slight vague tenderness over the anterior-lateral aspect of the knee. Id. He determined that the Plaintiff's left knee had 0-120 degrees range of motion, and reported that the Plaintiff felt she could bend it further. Id. Dr. Waxman's notes state that the Plaintiff's physical therapist reported 128 degrees flexion. Id. Dr. Waxman also observed that the Plaintiff had noticeable quadriceps atrophy of her left leg. Id. Dr. Waxman recommended continued physical therapy on her quadriceps, reducing medication to Tylenol and 10mg Bextra tablets, and further recommended that she remain off from work for another month. Id.

On November 29, 2004, the Plaintiff visited Dr. Waxman for a two-month followup on her left knee replacement. (R. at 227) The Plaintiff's left knee was slightly enlarged and had slight tenderness around it, and although her right knee had no effusion, it had medial, anterior, and lateral tenderness. Id. Dr. Waxman determined that the Plaintiff had 5-110 degrees range of motion in her left knee and 0-135 degrees of motion in her right knee. Id. In his examination, he noted some

---

initially referred for knee range of motion, knee VMO strengthening and stabilization exercises, balance and proprioception exercises, and modalities for pain and effusion. (R. at 319) She attended 18 sessions during this initial referral period and showed general improvement in lower extremity strengthening. (R. at 291) She was referred again to Healthworks by Dr. Waxman following her knee revision surgery, and after 12 sessions her therapist reported that she showed good progress in improving her quad setting, range of motion, and tolerance to exercise, and "steady but slow improvement" in knee effusion. (R. at 268) Upon re-referral, she attended 9 more sessions but did not make any significant improvement due to increased bilateral knee pain, increased joint effusion, and an overall decrease in her level of function. (R. at 257)

continued extensor lag, which he believed to be related to chronic weakness around the left knee.

Id.  He also found that her right knee does have some arthritis, and that she may have had a torn posterior lateral meniscus.  Id.  Dr. Waxman recommended that the Plaintiff take only Tylenol for her arthritis and continue leg strengthening physical therapy and exercises for her quadriceps and knees.  Id.  At the time, Dr. Waxman did not feel that the Plaintiff was ready to return to work, but felt that she could be back to work within one month.  Id.

On December 29, 2004, the Plaintiff visited Dr. Waxman for a followup on her left knee replacement.  (R. at 226)  Dr. Waxman reported that the incision on her knee appeared well healed. Id.  Her knee had -5 degree active extension, 0 degree passive extension, and 130 degree flexion. Id.  Dr. Waxman's impression was that she was doing very well four months after the revision, and he recommended that she continue her exercise program.  Id.  He also stated that she was ready to return to work in her catering supervision position on January 10, 2005, with work as tolerated.  Id. Dr. Waxman requested that the Plaintiff return in a couple months for a followup, but stated in his report that in two months she may postpone that appointment and reschedule for September 1, 2005, if she has not encountered any problems.  Id.  A handwritten note at the bottom of the report, dated February 28, 2005, states that the Plaintiff canceled her appointment and rescheduled for September 5, 2005, because her knee was better.  Id.

The Plaintiff visited St. Joseph's Hospital in Buckhannon, West Virginia, on July 26, 2005, complaining of a knee injury.  (R. at 367)  X-rays taken on that date showed no fractures in the knee. (R. at 367)

On September 8, 2005, the Plaintiff was evaluated by Dr. Waxman after reporting that her left knee had buckled while walking around the Wal-Mart with her niece.  (R. at 223)  Dr. Waxman

noted that the Plaintiff still had knee swelling and pain but that it seemed to be a muscular problem related to an imbalance in her extensor mechanism. Id. He further noted that her knee is stable, has a good range of motion, and that the x-rays all look good. Id. Dr. Waxman opined that the Plaintiff needed some quadriceps strengthening of her left leg to obtain a better gait and to stabilize her left knee, and referred her to physical therapy. (R. at 224)

Images of the Plaintiff's right knee, taken by United Hospital Center on October 7, 2005, showed medial joint compartment narrowing and degenerative spurring. (R. at 333) Mild degenerative spurring was also seen at the patellofemoral joint. Id. An MRI of the right knee indicated a vertically-oriented meniscal tear involving the anterior horn of the lateral meniscus. (R. at 334) A subchondral cyst was also indicated on the lateral tibial plateau. Id.

The Plaintiff was admitted to St. Joseph's Hospital in Buckhannon, West Virginia, on May 16, 2006, with nausea and vomiting. (R. at 366) The physician's report from that visit states that the Plaintiff had a normal gait and station. Id.

On May 24, 2006, the Plaintiff visited Dr. Onishi for a followup after her hospitalization. (R. at 394) During the followup, she discussed her osteoarthritis with Dr. Onishi, who recommended prolotherapy to her.[6] Id.

On June 14, 2006, the Plaintiff visited Dr. Onishi to followup on her osteoarthritis. (R. at 392) A physical examination showed a swollen right knee and tenderness along the medial and lateral aspect of the patella, and he diagnosed the Plaintiff with degenerative joint disease in her

---

[6] Prolotherapy involves injecting irritant solutions into the body near tendons and ligaments in an effort to force healing and strengthening of the connective tissues and alleviate muscle pain. (R. at 478-80) The procedure is briefly discussed in the record during the ALJ hearing and in greater detail in an information sheet submitted by Dr. Onishi to the Plaintiff's attorney. (See R. at 71-72, 478-80)

right knee, lower back pain, and osteoarthritis.  Id.  Prolotherapy was discussed with the Plaintiff, and after approval this treatment was performed on the Plaintiff's right knee.  Id.  She was prescribed hydrocodone 5, #60, for pain.  Id.

2.      Evidence Postdating The Alleged Onset Date

On June 28, 2006, the Plaintiff visited Dr. Onishi for a followup on the degenerative joint disorder in her knees.  (R. at 392)  She stated that the prolotherapy did not help much, that she was still having a lot of pain, and that the hydrocodone did not help her.  Id.  Prolotherapy was performed, and the she was prescribed medication for pain.  Id.

On July 12, 2006, the Plaintiff visited Dr. Onishi to followup on her right knee pain and osteoarthritis.  (R. at 391)  She stated that the prolotherapy injections were not helping and her patella dislocated the prior week.  Id.  Dr. Onishi observed tenderness along her right knee, diagnosed her with knee pain, and performed prolotherapy injections. Id. Dr. Onishi also prescribed Talwin NX for pain.  Id.

On July 26, 2006, the Plaintiff visited Dr. Onishi for a followup, complaining of severe pain in her right knee.  (R. at 390)  The prolotherapy treatment previously performed on her knee caused her severe pain and she was having a hard time walking.  Id.  Dr. Onishi observed tenderness along her right knee that got worse along the inferior aspect and lateral aspect.  Id.  He recommended further injections in her right knee.  Id.  He also reduced the Plaintiff's prescription to half a tablet of Talwin NX for pain.  Id.

On August 8, 2006, the Plaintiff visited Dr. Onishi for a followup.  (R. at 389)  Prolotherapy was done on her knee and her Darvocet prescription was refilled.  Id.

On August 23, 2006, the Plaintiff visited Dr. Onishi for a followup on her low back pain and

right knee pain.  (R. at 388)  Prolotherapy was done on her knee.  Id.

On September 11, 2006, the Plaintiff visited Dr. Waxman for a two-year followup on her revision left knee replacement.  (R. at 232-33)  She had no effusion in the left knee, did not seem tender to palpation, and had 0-130 degrees flexion-extension.  Id.  X-rays showed that the revised knee components remained in very good position without change or problem and that the patella had some lateral tilt but remained well centered.  Id.  Dr. Waxman reported that she walked unnaturally stiff and had diffuse disabling symptoms from "relatively mild documented arthritic problems."  Id.  His impression was that the knee replacement was doing okay, and he encouraged the Plaintiff to be as active as possible because "if she can keep things moving I think she will have less pain and problems."  (R. at 232-33)

On September 13, 2006, the Plaintiff visited Dr. Onishi for a followup on her osteoarthritis.  (R. at 387)  She reported nausea and vomiting from her use of a fentanyl patch, so this medication was discontinued.  Id.  She had tenderness along the iliac crest and tenderness along her right knee, especially along the mediolateral collateral ligaments.  Id.  She was started on methadone 5 mg for pain and prolotherapy was performed on her right knee.  Id.

On September 27, 2006, Dr. Fulvio Franyutti, M.D., a state agency physician, completed a physical residual functional capacity ("RFC") assessment of the Plaintiff.  (R. at 372-79)  Dr. Franyutti determined that the Plaintiff had the following exertional limitations: she could occasionally lift 20 pounds, frequently lift 20 pounds, stand and/or walk for a total of about 6 hours in an 8-hour workday, sit for a total of about 6 hours in an 8-hour workday, and push/pull without limitation.  (R. at 373)  As far as postural limitations, Dr. Franyutti determined that the Plaintiff could occasionally climb ramps/stairs, balance, stoop, and crawl; and could never climb

ladders/ropes/scaffolds, kneel, or crouch. (R. at 374) The Plaintiff had no manipulative, visual, or communicative limitations. (R. at 375-76) Dr. Franyutti found the following environmental limitations: unlimited exposure to wetness, humidity, noise, and fumes/odors/gases; and avoid concentrated exposure to extreme cold, extreme heat, vibration, and hazards. (R. at 376) Dr. Franyutti found that the Plaintiff's complaints were consistent with the medical evidence, finding that her complaints of significant pain and limitations "appears credible." (R. at 377)

On September 29, 2006, the Plaintiff visited Dr. Onishi for a followup on her right knee pain. (R. at 386) Her Darvocet prescription was refilled and prolotherapy was done. Id.

On October 13, 2006, the Plaintiff visited Dr. Onishi for a followup on her right knee pain (R. at 385) She had tenderness along the medial aspect of her right knee. Id. Prolotherapy was done and she was prescribed Demerol 50mg for pain and Phenergan 25 mg for nausea. Id.

On November 1, 2006, the Plaintiff visited Dr. Onishi for a followup on her right knee pain. (R. at 384) She had tenderness along the medial and lateral collateral ligament, as well as deep tenderness and weakness of the right knee. Id. Prolotherapy was done and she was prescribed Cymbalta for depression. Id.

On November 15, 2006, the Plaintiff visited Dr. Onishi for a followup on her right knee pain. (R. at 383) Dr. Onishi found that she had tenderness along the right knee that was worse on the medial aspect. Id. Prolotherapy was done on the right knee and she was given an antibiotic for an infection in her index finger. Id.

On December 13, 2006, the Plaintiff visited Dr. Onishi for right knee pain and lower back pain. (R. at 456) She had tenderness along her right knee and medial collateral ligament. Id. Prolotherapy injections were administered to the right knee. Id.

On January 4, 2007, Dr. Atiya M. Lateef, M.D., a state agency physician, completed a physical RFC assessment of the Plaintiff. (R. at 401-408) Dr. Lateef determined that the Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand and/or walk about 6 hours in an 8-hour workday, sit for about 6 hours in an 8-hour workday, and push/pull without limitations. (R. at 402) The Plaintiff could occasionally climb ramps/stars, balance, stoop, kneel, crouch, and crawl; she could never climb ladders/ropes/scaffolds or crawl. (R. at 403) Dr. Lateef found no manipulative, visual, or communicative limitations. (R. at 404-05) As far as environmental limitations, Dr. Lateef opined that the Plaintiff should avoid concentrated exposure to extreme cold and vibration, and avoid even moderate exposure to hazards. (R. at 405) Dr. Lateef found that the Plaintiff could have unlimited exposure to extreme heat, wetness, humidity, noise, and fumes/odors/gases/poor ventilation. Id. Dr. Lateef noted that a prior RFC was done by Dr. Franyutti, who found the Plaintiff capable of an RFC of light work with postural limitations. (R. at 406) Dr. Lateef found the Plaintiff's claims to be mostly credible, and reduced the Plaintiff's RFC to light work only. (R. at 406-08)

The Plaintiff visited Dr. Onishi on January 10, 2007, for knee and back pain. (R. at 454) She had a tender SI joint that was worse on the left side and tenderness along her right knee. Id. Prolotherapy injections were administered to the right knee, left SI joint, and lower back. Id. The Plaintiff's Demerol prescription was refilled. Id.

Dr. Onishi examined the Plaintiff on January 22, 2007, finding tenderness in the right SI joint, tenderness in the right knee, and tenderness in the right wrist. (R. at 452) The Plaintiff told Dr. Onishi that the last injection helped her knee for one day, but afterward the pain returned. Id. A prolotherapy injection was administered to the right knee and right SI join, an x-ray was taken of

the right wrist, and she was prescribed Atarax for her anxiety.  Id.  The x-rays showed no evidence of fracture, dislocation, or other bony or soft tissue defects.  (R. at 470)  The Plaintiff's wrist x-rays appeared normal.  Id.

On February 5, 2007, the Plaintiff visited Dr. Onishi for a followup on depression, right knee pain, and back pain.  (R. at 451)  Dr. Onishi administered an injection in the right knee, refilled her Demerol prescription, and directed her to continue taking Cymbalta for the depression.  Id.

On February 21, 2007, the Plaintiff visited Dr. Onishi for knee pain.  (R. at 450)  She did not believe that the injections were helping, and she had a lot of crepitus in her knee.  Id.  Dr. Onishi administered an injection behind the knee and instructed the Plaintiff to return in two weeks.  Id.

The Plaintiff visited Dr. Onishi on March 9, 2007, for a followup on her right knee pain.  (R. at 449)  She stated that the injections she was receiving did not help, and that she still has pain that feels like stabbing in her knees.  Id.  Dr. Onishi administered a steroid shot in the knee and refilled her Demerol prescription.  Id.

On April 16, 2007, the Plaintiff was treated by Dr. Onishi for right knee and back pain.  (R. at 447)  She informed Dr. Onishi that she would like to restart prolotherapy injections and discussed the possibility of surgery on her knee.  Id.  Dr. Onishi refilled her Demerol prescription and administered prolotherapy injections into the right knee joint and anterior patella.  Id.

On April 30, 2007, Dr. Onishi performed a recheck on the Plaintiff's knee.  (R. at 445)  An MRI taken of the Plaintiff's knees showed mild degenerative changes and a lateral meniscus tear, which Dr. Onishi noted as "not much change is [sic] since two years ago."  Id.  Dr. Onishi administered injections to the right and left knees, and referred the Plaintiff to Dr. Hubbard at WVU for a consultation.  Id.

On May 15, 2007, the Plaintiff was treated by Dr. Onishi on a followup for knee pain. (R. at 443) Dr. Onishi noted mild swelling in the Plaintiff's right knee and administered injections in the right knee. Id.

On May 30, 2007, the Plaintiff visited Dr. Onishi for a followup visit, complaining of a lot of pain in her legs, worse on the right side, and pain in her wrist and elbow. (R. at 442) She reported that she fell down about a month prior to her visit, injuring her wrist. Id. She further stated that the pain in her knee was "like somebody stabbing there." Id. Dr. Onishi found tenderness in her right wrist and elbow and swelling in her right and left knees. Id. He administered injections to the right wrist, right elbow, and both knees. Id. He refilled her Demerol prescription and directed her to return in two weeks. Id.

On June 7, 2007, the Plaintiff visited Dr. George K. Hal at the orthopedic clinic of WVU with complaints of right-sided knee pain that has been persistent for several years. (R. at 413) She also reported right wrist and right-hand pain, as well as a rash/discoloration along her arms. Id. Dr. Hal noted a mild effusion of the right knee and significant crepitus, but found that she had full extension to at least 110 degree of flexion and ligament stability. Id. Dr. Hal wished to examine the Plaintiff for inflammatory-related illnesses to rule out any connection between the reported rash and her joint pain. Id. Films taken of the Plaintiff's knees revealed possible osteolysis in the left knee and degenerative arthrosis in the right knee. (R. at 415) An MRI showed mild degenerative joint disease and a tear in the anterior horn of the lateral meniscus. (R. at 416) A total body bone scan was normal other than the knee prosthesis. (R. at 417)

On June 12, 2007, the Plaintiff visited Dr. Onishi for a followup on her right knee and complaints of pain in her wrist. (R. at 440) Dr. Onishi reported that the Plaintiff saw the orthopedic

surgeon in Morgantown, who did not recommend surgery.  Id.  He gave the Plaintiff injections in her right knee and wrist, made her an appointment to see a rheumatologist, and directed her to return in three weeks.  Id.

Dr. Shelly Kafka, a rheumatologist, examined the Plaintiff on June 26, 2007.  (R. at 463-64)  Dr. Kafka noted severe crepitus in the right knee but found no other problems.  (R. at 464)  A bone scan was scheduled.  Id.

On July 19, 2007, Dr. Kafka examined the plaintiff on a follow-up.  (R. at 461-62)  A bone scan conducted on July 3, 2007, was found to be negative.  (R. at 417, 462)  Dr. Kafka recommended the Plaintiff continue with her current treatment.  Id.

On August 8, 2007, the Plaintiff visited Dr. Onishi for pain in her knee, elbow, and wrist.  (R. at 437-38)  Dr. Onishi gave injections in both of her knees and requested her to return in one month.  (R. at 438)

Dr. Onishi treated the Plaintiff on August 21, 2007, for pain in her right knee, elbow, and wrist.  (R. at 436)  She had mild swelling in her right knee, tenderness along her patella, tenderness along the right wrist, and epicondylitis.  Id. Dr. Onishi administered injections in the Plaintiff's right knee, elbow, and wrist, and instructed her to return in two weeks for a followup.  Id.

Dr. Onishi saw the Plaintiff on September 4, 2007, for a two week recheck.  (R. at 435)  She presented symptoms of bilateral knee swelling, and was given injections in both knees, her right elbow, right wrist, and right first and second PIP joints.  Id.  Her Demerol prescription was also refilled.  Id.

The Plaintiff visited Dr. Onishi on September 18, 2007, for a two week recheck.  (R. at 434)  She still had a lot of pain in her knees, wrist, and elbow, and Dr. Onishi discussed with her the

option of using hydromorphone for pain control.  Id.  Injections were given in her right wrist, knee, and elbow, and Dr. Onishi prescribed 5 mg oxymorphone.  Id.

Dr. Onishi treated the Plaintiff on October 9, 2007, for right knee pain and wrist pain.  (R. at 433)  She had tenderness in her right knee along her medial collaterial ligament and tenderness in her right wrist.  Id.  Injections were given in her right knee and right wrist, and she was instructed to return in two weeks.  Id.

Dr. Onishi took x-rays of the Plaintiff's knee on October 19, 2007, at St. Joseph's Hospital of Buckhannon.  (R. at 459)  The x-rays revealed a well aligned total knee replacement and no acute process.  Id.

The Plaintiff visited Dr. Onishi on October 23, 2007, for a followup visit, complaining of a lot of pain in both knees, worse on the right side on the lateral aspect of her femur with a lot of crepitus.  (R. at 432)  She reported that her wrist felt better that day.  Id.  Injections were given in the right knee and left knee below her surgical scar, and she was instructed to return in one week.  Id.

The Plaintiff visited Dr. Onishi on October 29, 2007, for a followup visit on wrist pain and pain in her right elbow.  (R. at 431)  Dr. Onishi noted that her right wrist was tender and lax.  Id.  He also reported laxity along the right ulnar bone, and lateral epicondylitis.  Id.  Dr. Onishi injected her left knee, right wrist, right elbow, and first and second MTP and PIP joints.  Id.

Dr. Onishi examined the Plaintiff on November 14, 2007, for a two-week recheck on pain in her knee and wrist.  (R. at 430)  He observed tenderness in the wrist and knee, and gave her injections in her right wrist, right PIP joint, right knee, medial, lateral collateral ligament, and left knee below her artificial knee.  Id.

On December 3, 2007, the Plaintiff visited Dr. Onishi for injections. (R. at 429) Dr. Onishi noted laxity on the right wrist joint and degenerative joint disease changes in the knees, but also noted that her left knee had improved since the last injection. Id. He gave the Plaintiff injections in her wrist, the second digit of her right hand, and left knee surgical scar. Id. Dr. Onishi also noted that the Plaintiff was using hydromorphone without any relief from pain. Id.

The Plaintiff visited Dr. Onishi on January 4, 2008, complaining of a lot of pain in her right knee and right wrist. (R. at 427) Dr. Onishi observed degenerative joint disease changes in the right knee and tenderness along the right wrist. Id. The right knee and right wrist were injected, and the Plaintiff was instructed to followup in two weeks. Id.

Dr. Onishi treated the Plaintiff on January 18, 2008, reporting that her left knee had popped out. (R. at 481) Her right knee continued to have pain, and although her right wrist had improved she was suffering from more pain in her fingers at the first and second metacarpal joint. Id. Dr. Onishi administered injections to the Plaintiff's left knee, right wrist, and the first and second metacarpal joints on her left hand.[7] Id.

On February 13, 2008, the Plaintiff was treated by Dr. Onishi for pain in both knees and pain in her right elbow. (R. at 485) Injections were given to her right knee and right elbow. Id.

On February 26, 2008, Dr. Onishi treated the Plaintiff for pain in her right hand. (R. at 487-88) At that time, her hand was cold and black in color, and she reported it had been that way for a few days. Id. She denied any recent traumatic events, but reported that she fell and injured that

---

[7] The undersigned Magistrate Judge notes that Dr. Onishi's progress notes for this visit states that the injection was administered to the Plaintiff's first and second metatarsal joint; however, this appears to be a clerical error because the metatarsal bones are located in the foot and Dr. Onishi's progress note assessment lists "l Pain In Joint Involving Hand." (See R. at 481)

hand several months prior.  Id.  Dr. Onishi, suspecting that the Plaintiff may be suffering from reflex sympathetic dystrophy, referred her to Dr. Mossallati for a vascular consult.  Id.

On February 28, 2008, Dr. Onishi treated the Plaintiff's knee, back, wrist, and elbow pain. (R. at 488)  Injections were administered to both knees and her right hand.  (R. at 488)

On March 3, 2008, the Plaintiff visited Dr. Saad Mossallati, M.D., on a referral to investigate possible vascular insufficiency that may relate to weakness and pain in her right upper extremity. (R. at 471-72)  An ultrasound of her right upper extremity was performed, which showed satisfactory arterial blood flow.  (R. at 471)  The Plaintiff was also examined on March 3 by Dr. Adnan Alghadban, M.D., who administered an EMG nerve conduction study.  (R. at 473-75)  The results of that study were normal – there was no evidence of neuropathy, carpal tunnel syndrome, or radiculopathy in her upper extremities.  (R. at 475)  Dr. Alghadban's report states that there was no indication of thoracic outlet syndrome, or any evidence of ischemia.  (R. at 473-75)  A physical examination revealed that the Plaintiff had 5/5 motor strength in all four extremities, normal reflexes, normal coordination, normal gait, and normal position.  (R. at 473)  After considering these findings, both Dr. Mossallati and Dr. Alghadban believed that the Plaintiff had tendonitis and possibly a mild form of Raynaud Phenomenon.  (R at 471. 473)  Dr. Mossallati prescribed Motrin 400 mg twice a day, and recommended the Plaintiff avoid cold weather.  Id.

A letter dated March 6, 2008, from Dr. Onishi to the Plaintiff's attorney states that the Plaintiff suffered from severe osteoarthritis, back pain, a failed total knee replacement, and reflex sympathetic dystrophy.  (R. at 476-77)  Dr. Onishi states in the letter that although he has seen the Plaintiff every two weeks to perform pain management with narcotic medication, osteopathic manipulation, and prolotherapy pain management injections, she has not had any improvement with

treatment. (R. at 476) She uses a cane to walk and a knee brace to stabilize her knee, and recently she has developed reflex sympathetic dystrophy in her right hand, which is causing her to lose use of her right hand. Id.

On March 13, 2008, the Plaintiff was evaluated by John DiBacco, a physical therapist at Elkins PT and Sports Injury Clinic, for a functional capacity evaluation. (R. at 489-92) During the musculoskeletal examination, normal sensation to light touch was noted throughout the upper extremities; however, some altered sensation was noted along the right hand fingertips, and tenderness to palpation was noted throughout the carpals of the right hand, along the MCP joints, and in the PIP joints. (R. at 490) Her right knee was tender to palpation along both joint lines and along the medial and lateral patellar borders. Id. The left knee was tender along the incision from her previous surgery. Id. Manual muscle testing (MMT) showed a strength of 5/5 MMT for right knee flexion and extension, and 4/5 MMT for left knee flexion and strength. Id. She had full extension and 130 degree of flexion in both knees. Id. On the occasional material handling portion of the examination, the Plaintiff was able to handle weights in the range of 5-8 pounds. Id. She was able to lift an 8 pound weight placed at floor level by bending forward at the waist, but was unable to lift any weight by utilizing a squatting type posture. (R. at 490-91) On the frequent material handling portion of the examination, she was able to lift weights in the range of 4-6 pounds. (R. at 491) On the constant material handling portion, she was able to lift weights in the range of 2-3 pounds. Id. For non-material handling tasks, Mr. DiBacco opined that the Plaintiff would not be able to perform bending at the waist on an occasional basis, squatting or kneeling in a work setting, or stair climbing/ladder climbing/crawling due to degenerative changes in her knees. Id. Sitting would be limited to the occasional frequency of 30 minutes, standing and walking would be limited

to 15 minutes of prolonged activity, forward reaching could be performed on a constant basis, overhead reaching would be limited to a frequent basis, and she would be able to operate light arm controls with the left upper extremity only.  Id.  She would not be able to operate foot controls with either lower extremity.  Id.  Mr. DiBacco also noted that, by the end of the test, the Plaintiff reported a significant increase in her pain levels.  (R. at 492)

**D.**   **Testimonial Evidence**

At the ALJ hearing held on March 27, 2008, the Plaintiff testified that she was 41 years old, 6'1" tall, and weighed 204 pounds, up from 180 pounds when she was working.  (R. at 59-60)  She has a driver's license, but she does not drive because she takes Demerol for pain and does not want to drive under the influence.  (R. at 60-61)  Her onset date was June 17, 2006, and she has not worked since that day, although she does take occasional trips to her daughter's school to attend class parties, which last around 30 minutes.  (R. at 62)

The Plaintiff last worked as a catering director for Aladdin foods, which works in conjunction with West Virginia Wesleyan College to cater various campus and community events.  (R. at 63-66)  Her job was to supervise all of the major events and to supervise the catering crews, which could number up to 15 people.  (R. at 63-64)  She also performed some desk work, such as answer telephones, plan menus, schedule meetings, and light computer work.  (R. at 65)  She worked for Aladdin for 7 years full time.  (R. at 66)  Prior to catering for Aladdin, the Plaintiff worked for nine years at the Bicentennial Motel as a desk clerk and caterer.  Id.

The Plaintiff testified that in 1989 she had knee reconstruction surgery on her left knee, followed by a total knee replacement in 2003.  (R. at 68-69)  Ten months later, in 2004, a revision was done to implement a completely new prosthesis design.  (R. at 69)  She has an arthritic

condition in her right knee that she attributes to wear from taking the pressure off her left knee and the fact that her left leg is slightly longer.  (R. at 69-70)  She currently favors the left leg over the right leg, and uses a cane to keep her balance.  (R. at 75)  She can walk on level ground for about ten minutes before she starts to feel pain, and can do so without a cane but says she would be very unsteady.  (R. at 77)  She can stand in one place for three or four minutes, but afterwards she would need to shift her weight or move around.  Id.

The Plaintiff fell in her home about  year before the hearing, injuring her arm.  (R. at 70)  Although she did not break any bones, her hand and elbow swelled and bruised really bad.  Id.  She has had constant pain since that injury, and about a month prior to the hearing her hand turned completely black.  (R. at 71)  Her physician, Dr. Onishi, sent her to two different doctors for evaluations, and he has diagnosed her with a reflex syndrome in her hand.[8]  Currently, she receives treatment from Dr. Onishi in the form of "prolotherapy" injections, which are injections of irritant solutions into the areas surrounding the joints to stimulate the body's healing mechanisms.  (R. at 71-72)

The Plaintiff takes Demerol pills and uses Lidoderm patches to manage her pain.  (R. at 72-73)  She rated her daily pain as a 6 or 7 on a scale of 10 "most of the time," with the pain concentrated in her back, hips, knees, feet, and hand.  (R. at 74-75)  She stated that if she is too active it aggravates that pain, and if she does too much then she is not able to move the next day.  (R. at 75)  She described the pain in her right knee as a sharp, jabbing pain like someone stabbing her in the joint with a butcher knife.  Id.  The left knee pain she described as more of a burning,

_____

[8] The Plaintiff was unable to recall the name of the syndrome during the hearing, but Dr. Onishi's records reflect a diagnosis of reflex sympathetic dystrophy. (R. at 476)

hurting pain that burns.  Id.  Her right hand is sore to the touch, and her fingers hurt when she bends them or straightens them out.  Id.  Her lower back constantly aches, with increasing pain if she sits too long.  Id.  Her hips sometimes hurt so bad she cannot walk.  Id.

The Plaintiff also testified that she is currently taking Cymbalta and Lexapro for depression. (R. at 73)  She states that her depression is due to having a hard time giving up work, but she is not currently seeing a psychiatrist or psychologist.  Id.  She stated that she does not have a need to see a counselor or therapist because Dr. Onishi does a good job listening to her problems and prescribing her medication.  Id.  She gets anxious in crowds because of her fear of falling, and when people get too close she feels like she is off balance.  (R. at 80)

The Plaintiff gets severe pain in the lower back and hips if she bends at the waist.  (R. at 77) She cannot bend her knees and squat.  (R. at 77-78)  She is right-handed, but she has better grip in her left hand than her right due to pain.  (R. at 78)  She wears a splint on the right arm and wrist to help with the pain and to give her more stability for picking things up, but she stated that it can be hard to pick up things like a coffee cup.  (R. at 77-78)  She can, however, hold a fork and spoon, drink, button her blouse, pull things over her head, and lift roughly 5 pounds.  (R. at 78-79)  She can also take care of her personal hygiene needs, but she has a handicap commode and a bathtub chair for bathing.  (R. at 81-82)  Sitting is painful, and she can only sit for around thirty minutes without moving around.  (R. at 79)  The trip to the ALJ hearing took 90 minutes, and she developed a lot of pain in her lower back, knees, and foot during the course of the ride.  (R. at 61)

Larry Bell, a vocational expert, also testified at the hearing on March 27, 2008.  (R. at 89-98) Mr. Bell classified the Plaintiff's prior work experience as a catering director as medium and skilled labor, and her work as a hotel clerk as light and semi-skilled.  (R. at 89)  Overall, he described her

past work experience as medium and skilled. (R. at 90) In regard to the Plaintiff's ability to return to her prior work, Mr. Bell gave the following responses to the ALJ's hypothetical:

> Q. All right. Ms. Wilson's profile is a younger individual. She's between the ages of 40 and 41. She has a high school education, and of course the work that you've identified at the medium exertional level. In order to make sure that the record is complete in terms of the evidence let's assume the hypothetical individual could perform light work. By that I mean lifting only 20 pounds occasionally, 10 pounds frequently. According to the assessments, this hypothetical person could stand and walk six hours in an eight-hour day with normal breaks. Sit six hours in an eight-hour day with normal breaks. Such a person could only occasionally climb ramps and stairs, balance, stoop, and crouch. Never climb any ladders, ropes, or scaffolding. And never crawl. Avoid concentrated exposure to temperature extremes. By that I mean heat and cold. Vibration. And hazards involving moving plant machinery. And unprotected heights. This is taken from the record at Exhibit 8F and Exhibit 10F. Now if that hypothetical person was to return to the work that the Claimant had in the past, obviously from your definitions, since her past work was medium as defined and as performed, light work would not be available to her. Is that correct?

> A. That's correct.

> . . .

> A. With that, Your Honor, if you combine the whole job as described – if it was just the hotel clerk – that in and of itself would not eliminate the hotel clerk.

> Q. So a desk clerk job would be consistent if it were separate?

> A. If it were separate.

> Q. Now a part of the job as she performed it?

> A. That's correct.

(R. at 91)

Incorporating the above hypothetical in his questions, the ALJ then questioned Mr. Bell as to the Plaintiff's ability to perform other jobs at the light exertional level. At the light level, the hypothetical individual, if she could not return to the Plaintiff's past work, would be able to function

as an office assistant, light, with 150,000 jobs nationally and 1,850 jobs regionally in West Virginia, Eastern Ohio, Western Maryland, and Western Pennsylvania.  Id.  The hypothetical individual could also perform the work of a gate checker checking ID's at events, which is a light job with 390,000 positions nationally and 1,250 positions regionally.  (R. at 91-92)  Additional limitations providing "an option to change positions from sitting to standing at the work station.  And need to use an assistive device of a cane when ambulating" would not eliminate either the desk clerk or the gate checker positions.  (R. at 92)  If the hypothetical individual had limitations in the use of the right hand for manipulation, fingering, and feeling to the level of frequent, it would preclude the office assistant work but would not preclude the gate checking work.  Id.  Additionally, there would be some machine tender jobs that would fit the above hypothetical with all of the movement and fingering restrictions to occasional use, with 327,000 jobs nationally and 2,5000 jobs regionally; however, Mr. Bell opined that he would reduce those job numbers by one-half.  (R. at 93-94)

Next, the ALJ questioned Mr. Bell as to the Plaintiff's ability to work at the sedentary exertional level and to work if she is completely credible as to the severity of her condition:

> Q.     All right.  Now the final hypothetical would be the sedentary exertional level of work.  For sedentary an individual would only have to lift ten pounds occasionally, five pounds or less on a frequent basis.  Excuse me, I'm having – the standing and walking for sedentary work is two hours in an eight-hour day.  Consider the use of a cane to ambulate if walking is required.  Sitting could be six hours in an eight-hour day with normal breaks.  The postural activities, again, only occasionally climbing ramps and stairs, balancing, stooping, crouching.  Never climb ladders, ropes, or scaffolds, crawl, or kneel.  Avoid concentrated exposure to heat and cold, vibration, and hazards of moving machinery, and unprotected heights.  Consider the use of the right upper extremity hand and arm for manipulation, fingering, feeling, handling, to be at the level of frequent.  If that would be the case, would there be any jobs at sedentary?
>
> A.     At the sedentary level the general sorter.  Excuse me.  Sedentary 50,000 nationally, 650 regionally.  And also at the sedentary would be machine

tender, 141,000 nationally, 1,400 regionally. And I'd give the same reduction of 50 percent on that.

Q.  If Ms. Wilson's testimony is completely credible and her medical evidence supports the fact that she has no ability to do any exertional level of work – not only her past work at the medium level as defined and as performed, but at the light level. At the light level with the ability to change positions throughout the workday, and the ability to use an assistive device when ambulating. Or at sedentary, again, using a cane to ambulate, and the – and considering her frequent use, she has no ability to use her right hand and arm which is dominant. Her knees would preclude the ability to allow her, because of pain and other discomfort, to be off task more than ten percent of the time in an eight-hour workday, for a period of five days a week or forty hours, whichever you consider. And absences – the absences would cause her to miss work because of exacerbations of pain and discomfort that would require her to be basically off her feet for periods of time in excess of those which are vocationally acceptable. If that would be the case, would there be any jobs?

A.  No, Your Honor. That would eliminate competitive work routine at any level.

(R. at 94-95) Finally, the Plaintiff's attorney questioned Mr. Bell, modifying the ALJ hypotheticals

to reflect additional functional limitations:

Q.  If in the hypotheticals that were dealing with light work – excuse me – the person during the period of time which they were standing or walking had to use a cane in their right dominant hand, so that they would only have their left hand for use in work. How does that affect the jobs that were named?

A.  I don't believe that would be – that would allow for those jobs.

Q.  Does it allow for any jobs at light work?

A.  I don't believe so, no.

Q.  If the person had to sit or had to have the change of position option that was given in the earlier hypothetical, would that affect [sedentary work]?

A.  Then that would because you would have to use both hands, even if you were standing to do the task.

Q.  So if we take a regular definition for sedentary work which would require

two hours of standing or walking during the day, would that limitation eliminate sedentary work?

A.    Yes.  With that as you described.

(R. at 96-97)

## E.    **Lifestyle Evidence**

At the ALJ hearing, the Plaintiff testified that she gets up around 5:00 A.M. during the school year to help get her daughter off to school.  (R. at 82)  She drives her daughter down to the bus stop, and then goes back to bed until ten or eleven o'clock in the morning.  Id.  Occasionally she visits her daughter at school for class parties, but she usually just sits there and does not do any sort of volunteer work.  (R. at 63)  She also attends her daughter's basketball games, taking pain medication and sitting on the bottom row of the bleachers.  (R. at 84)

On a typical day she does some light housework, such as small loads of laundry, washing dishes, and light dusting.  (R. at 83)  Her daughter and her husband do most of the household chores, such as picking up around the house, outdoor chores, taking care of the family pets, vacuuming, and large meals.  (R. at 83-84, 161, 185)  She used to crochet but cannot do so now due to her hand.  (R. at 84)  She attends church regularly and tries to attend her daughter's parent-teacher organization meetings.  (R. at 84-85)

## III.  CONTENTIONS OF THE PARTIES

The Plaintiff, in her motion for summary judgment, moves the Court for summary judgment in her favor on the grounds that the decision of the Defendant is arbitrary, contrary to law, and unsupported by substantial evidence.  (Pl.'s Mot. for Summ. J. 1, ECF No. 8)  In support of her motion, the Plaintiff argues that:

1.    Dr. Onishi is a treating source as defined in the regulations and the letter that

he wrote summarizing the Plaintiff's treatment is a medical opinion that must be given controlling weight;

2.   If Dr. Onishi's letter is not entitled to controlling weight, the ALJ failed to properly weigh the opinion and give reasons for the weight he assigned it; and

3.   The ALJ did not give acceptable reasons for discounting the Plaintiff's subjective complaints of pain.

(Pl.'s Mem. in Supp. of Mot. for Summ. J. 9-14, ECF No. 9)  In response, the Defendant argues that

substantial evidence supports the ALJ's decision and should be affirmed as a matter of law.  (Def.'s

Mot. for Summ. J. 1, ECF No. 10)  The Defendant further argues that:

1.   The ALJ was not required to assign controlling weight to Dr. Onishi's medical opinion because findings of disability are reserved to the Commissioner and other medical evidence contradicts Dr. Onishi's findings as to the nature and severity of the Plaintiff's impairments;

2.   The ALJ properly weighed Dr. Onishi's opinion and provided adequate support for his decision to not assign it great weight because he referenced medical evidence in the record supporting his conclusion and was not required to specifically reference every piece of evidence in the record in making his disability determination; and

3.   The ALJ properly evaluated the Plaintiff's credibility as to her subjective complaints of pain because he discussed medical evidence supporting his conclusion as well as the Plaintiff's daily activities.

(Def.'s Mem. in Supp. of Mot. for Summ. J. 10-16, ECF No. 11)

## IV.  STANDARD OF REVIEW

The Fourth Circuit applies the following standards in reviewing the decision of an ALJ in

a Social Security disability case:

> Judicial review of a final decision regarding disability benefits . . . is limited to determining whether the findings . . . are supported by substantial evidence and whether the correct law was applied.  See 42 U.S.C. § 405(g) ( "The findings . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . .");
> Richardson v. Perales, 402 U.S. 389, 390, 91 S. Ct. 1420, 1422 (1971); Coffman v.

Bowen, 829 F.2d 514, 517 (4th Cir. 1987). The phrase "supported by substantial evidence" means "such relevant evidence as a reasonable person might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401, 91 S. Ct. at 1427 (citing Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S. Ct. 206, 216 (1938)) . . . . If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence." Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966). Thus, it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment . . . if the decision is supported by substantial evidence. See Laws v. Celebrezze, 368 F.2d at 642; Snyder v. Ribicoff, 307 F.2d 518, 529 (4th Cir. 1962).

Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Because review is limited to whether there is substantial evidence to support the ALJ's conclusion, "[t]his Court does not find facts or try the case de novo when reviewing disability determinations." Seacrist v. Weinberger, 538 F.2d 1054, 1056-57 (4th Cir. 1976). Furthermore, **"the language of § 205(g) . . . requires that the court uphold the decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'"** Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (emphasis added).

## V. DISCUSSION

A.     **Standard For Disability And The Five-Step Evaluation Process**

To be disabled under the Social Security Act, a claimant must meet the following criteria:

An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work . . . . "[W]ork which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

See 42 U.S.C. § 423(d)(2)(A). The Social Security Administration uses the following five-step sequential evaluation process to determine if a claimant is disabled:

(i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairments(s). If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.

[Before the fourth step, the residual functional capacity of the claimant is evaluated based "on all the relevant medical and other evidence in your case record . . . ." 20 C.F.R. § 404.1520.]

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520. If the claimant is determined to be disabled or not disabled at any of the five steps, the process does not proceed to the next step. Id.

**B.     The Decision Of The Administrative Law Judge**

Utilizing the five-step sequential evaluation process described above, the ALJ made the following findings:

> **1.     The claimant meets the insured status requirements of the Social Security Act through December 31, 2010.** (R. at 9)
>
> **2.     The claimant has not engaged in substantial gainful activity since June 17, 2006, the alleged onset date (20 CFR 404.1520(b) and 404.1571 *et seq.*).** Id.
>
> **3.     The claimant has the following severe impairments: Degenerative joint**

disease of the knees, status total left knee replacement and revision; right upper extremity tendonitis at the elbow and wrist **(20 CFR 404.1520(c))**. Id.

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 **(20 CFR 404.1520(d), 404.1525 and 404.1526).** Id.

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in **20 CFR 404.1567(a)** with a sit/stand option, Stand/walk two hours in an eight-hour workday, sit six hours in an eight-hour workday; work must allow the use of a cane when ambulating; and can use right hand for fingering and fine manipulation no more than frequently.  (R. at 10)

6.  The claimant is unable to perform any past relevant work **(20 CFR 404.1565).** (R. at 14)

7.  The claimant was born on November 16, 1966 and was 40 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date **(20 CFR 404.1563).** Id.

8.  The claimant has at least a high school education and is able to communicate in English **(20 CFR 404.1564).** Id.

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and **20 CFR Part 404, Subpart P, Appendix 2).** Id.

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform **(20 CFR 404.1560(c) and 404.1566).** Id.

11. The claimant has not been under a disability, as defined in the Social Security Act, from June 17, 2006 through the date of this decision **(20 CFR 404.1520(g)).** (R. at 15)

**C.    The ALJ Was Not Required To Assign Dr. Onishi's Letter Controlling Weight Because Portions Of The Letter Do Not Qualify As Medical Opinions And The Remainder Of**

## The Letter Is Inconsistent With Other Evidence In The Record

As her first assignment of error, the Plaintiff argues that a letter written by Dr. Onishi describing her symptoms and treatment is a medical opinion that is entitled to controlling weight because Dr. Onishi is a treating source under the regulations, his opinion is supported by his own examinations and the Plaintiff's medical records, and his opinion is uncontradicted by the evidence in the record. (Pl.'s Mem. in Supp. of Mot. for Summ. J. 9-10, ECF No. 9) In response, the Defendant asserts that the ALJ is not required to assign controlling weight to Dr. Onishi's letter because his statement that the Plaintiff cannot work is not a medical opinion and there is other medical evidence in the record that contradicts his objective findings. (Def.'s Mem. in Supp. of Mot. for Summ. J. 10-11, ECF No. 11) For the reasons set forth below, the undersigned Magistrate Judge finds that the ALJ was not required to assign controlling weight to Dr. Onishi's opinion.

A treating source is "your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you." 20 C.F.R. § 404.1502. The medical opinion[9] of a treating source as to the nature and severity of the claimant's impairments will be given controlling weight if the opinion is 1) well-supported by medically acceptable clinical and laboratory diagnostic techniques and 2) not inconsistent with other substantial evidence in the case record. 20 C.F.R. § 404.1527(d)(2). However, a statement by a treating source that a person is "disabled" or "unable to work" is not a medical opinion but is instead an opinion on an issue reserved to the

---

[9] Medical opinions are statements from physicians, psychologists, or other acceptable medical sources that "reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis, and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 1527(a)(2).

Commissioner.  See 20 C.F.R. § 1527(e).  No special significance is given to the source of an opinion on issues reserved to the Commissioner.  Id.

In a letter dated March 6, 2008, Dr. Onishi diagnosed the Plaintiff with severe osteoarthritis, back pain, a failed total knee replacement, and reflex sympathetic dystrophy, and further stated that "due to the nature of her disability, she is not having any improvement with treatment.  She is unable to work secondary to her pain and poor gait secondary to her unstable knee joints."  (R. at 476-77) Dr. Onishi clearly qualifies as a treating source under the regulations due to the fact that he has regularly treated the Plaintiff for her knee, back, and arm impairments over a period of two years. (See R. at 380-400, 427-460, 481-488)  Dr. Onishi's letter also qualifies as a medical opinion from a treating source because it contains diagnoses of the Plaintiff's impairments and statements about the severity of her impairments.  However, despite the fact that Dr. Onishi's letter qualifies as a medical opinion from a treating source, the ALJ was not required to assign the contents of that letter controlling weight.

The ALJ properly rejected Dr. Onishi's statement that the Plaintiff is "unable to work" and any references to her "disability."  Title 20, Part 404, Section 1527(e) of the Code of Federal Regulations directly and unequivocally addresses these kinds of statements and states that they are not medical opinions under the Social Security regulations.  See 20 C.F.R. § 404.1527(e).  Although such statements are not to be ignored by the adjudicator in making his decision, they "can **never** be entitled to controlling weight or given special significance," even if the statement is offered by a treating source.  SSR 96-5p, 1996 WL 374183, at *5 (July 02,  1996) (emphasis added).

The ALJ was not required to accept Dr. Onishi's diagnosis of reflex sympathetic dystrophy because the record fails to demonstrate any support for the diagnosis.  Dr. Onishi's letter does not

contain any objective findings that support his diagnosis and his treatment notes only make a passing reference to the disorder, referring the Plaintiff to Dr. Mossallati "for vascular consult may be from reflex sympathetic dystrophy." (R. at 487)  However, as the ALJ noted, when the Plaintiff visited Dr. Mossallati and Dr. Alghadban for this vascular consult, an ultrasound revealed satisfactory arterial blood flow to both arms and an EMG/nerve conduction study was normal, showing no evidence of neuropathy, carpal tunnel syndrome, or radiculopathy.  (R. at 12, 471-75)  Dr. Alghadban instead attributed her pain to tendonitis, mostly at the elbow level, and possibly a mild form of Raynaud Phenomenon.  (R. at 13, 471, 473)  Thus, the ALJ was under no duty to assign controlling weight to Dr. Onishi's diagnosis because it is unsupported by medically acceptable diagnostic techniques and contradicted by the findings of two other physicians.

The ALJ was not required to assign controlling weight to the remainder of Dr. Onishi's opinion because his opinion is inconsistent with other evidence in the record.  The ALJ's opinion discusses several pieces of medical evidence which undercut Dr. Onishi's opinion and are briefly summarized below.  A physical examination by Dr. Alghadban on March 3, 2008, found that the Plaintiff had 5/5 motor strength in her legs and normal gait, coordination, position, and reflexes.  (R. at 12-13, 473)  An examination by Dr. Kafka on June 26, 2007, revealed only crepitus, and a full body bone scan conducted on July 3, 2007, was normal.  (R. at 12, 417, 464)  An MRI performed on April 30, 2007, showed only mild degenerative changes and a tear of the anterior horn of the lateral meniscus, which had not changed much in two years.  (R. at 12, 445)  Two years after her knee replacement surgery, the Plaintiff, on September 11, 2006, told Dr. Waxman that although she still had some weakness, overall her knee was much better than before the surgery.  (R. at 232) Dr. Waxman believed the Plaintiff would have less pain if she stayed as active as possible.  (R. at 13,

233) Because this evidence conflicts with Dr. Onishi's characterization of the seriousness of the Plaintiff's impairments, the ALJ was not required to assign controlling weight to his opinion.

In summary, after reviewing the ALJ's opinion, the evidence of record, and the applicable regulations, the undersigned Magistrate Judge finds that portions of Dr. Onishi's letter fail to qualify as medical opinions under the regulations because they constitute opinions on issues reserved to the Commissioner. Additionally, the undersigned Magistrate Judge finds that the ALJ was not under a duty to assign controlling weight to the remainder of Dr. Onishi's opinion because there is substantial contradictory evidence in the record.

**D.** **Substantial Evidence Supports The Weight Given To Dr. Onishi's Opinion Because His Opinion Is Inconsistent With The Findings Of Two State Agency Medical Consultants And The Findings Of Various Specialists Who Treated The Plaintiff**

As her second assignment of error, the Plaintiff argues that even if Dr. Onishi's opinion was not entitled to controlling weight, the ALJ failed to weigh his opinion according to the factors outlined at 20 C.F.R. § 1527.[10] (See Pl.'s Mem. in Supp. of Mot. for Summ. J. 10-12, ECF No. 9) In response, the Defendant contends that the ALJ properly formulated the Plaintiff's RFC and rejected Dr. Onishi's opinion because it was not supported by the objective evidence of record.[11] (Def.'s Mem. in Supp. of Mot. for Summ. J. 11-15, ECF No. 11) After reviewing the ALJ's opinion

---

[10] The Plaintiff's argument is not explicitly stated in these terms, but does state that Dr. Onishi's opinion "was entitled to deference and must be weighed accordingly," and further states that a treating source opinion can only be rejected "through careful consideration of a number of specific factors." (Pl.'s Mem. 10, 12) The undersigned Magistrate Judge believes that the above restatement of the Plaintiff's argument best characterizes her objection to the ALJ's decision.

[11] The Defendant also argues that the ALJ properly rejected the opinion of John DiBacco, who performed a functional capacity evaluation on the request of Dr. Onishi. (R. at 489-92) However, the Plaintiff did not raise this issue in her motion or address it in a reply brief, so the undersigned Magistrate Judge deems it to be waived. See United States v. Jones, 308 F.3d 425, 427 n.1 (4th Cir. 2002) (arguments not raised in the opening brief are waived).

and the regulations, the undersigned Magistrate Judge finds that the ALJ properly explained his decision to discount Dr. Onishi's opinion.

If a treating physician's opinion is not given controlling weight, the following factors are used to determine the weight given to the opinion: 1) length of the treatment relationship and the frequency of examination, 2) the nature and extent of the treatment relationship, 3) the supportability of the opinion, 4) the consistency of the opinion with the record, 5) the degree of specialization of the physician, and 6) any other factors which may be relevant, including understanding of the disability programs and their evidentiary requirements. 20 C.F.R. § 404.1527(d)(2). When an ALJ does not give a treating source opinion controlling weight and determines that the Claimant is not disabled:

> the notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight. **This explanation may be brief.**

SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996) (emphasis added). However, the ALJ does not need to specifically list and address each factor in his decision, so long as sufficient reasons are given for the weight assigned to the treating source opinion. See Pinson v. McMahon, No. 3:07-1056, 2009 WL 763553, at *11 (D.S.C. Mar. 19, 2009) (holding that the ALJ properly analyzed the treating source's opinion even though he did not list the five factors and specifically address each one).

Although the ALJ did not explicitly address each factor in his notice of decision, he gave a sufficient explanation for the weight afforded to Dr. Onishi's opinion. The ALJ stated that he did not accepted Dr. Onishi's opinion because it was "not supported by the objective findings discussed

below." (R. at 12) The ALJ then proceeded to list evidence in the record which did not support Dr.

Onishi's opinion, starting with the opinions of two state agency medical consultants who both found

that the claimant retained the capacity for a range of light work with postural and environmental

limitations. (R. at 12) Next, the ALJ listed medical evidence from the record that did not support

Dr. Onishi's evaluation of the Plaintiff's knee condition:[12]

- Consultative evaluations performed by Dr. Kafka showed only severe crepitus in the right knee; (R. at 12)

- X-rays taken on October 7, 2005, revealed only mild degenerative changes in the knee, and an MRI taken on that date showed a vertically oriented tear on the anterior horn of the lateral meniscus. This tear was noted in a subsequent MRI taken on April 27, 2007, that otherwise showed only mild degenerative changes; Id.

- A whole body bone scan performed on July 3, 2007, was normal other than the presence of the Plaintiff's left knee prosthesis; Id.

- The Plaintiff was examined on June 7, 2007, for right knee pain, and although she did have mild effusion and crepitus in the right knee, she had a full extension to at least 110 degrees of flexion and her knee was stable ligamentously; Id.

- Dr. Waxman evaluated the Plaintiff on September 11, 2006, two years after performing the revision surgery on her left knee prosthesis. The Plaintiff reported that her left knee felt weak and she had some pain when she first got up, but after some questioning she stated that her left knee was significantly better than before the revision surgery. She had no effusion in the left knee and did not appear tender to palpation, she had 0-130 degrees of flexion-extension, and x-rays showed that the revised components were in good position without change. Dr. Waxman reviewed x-rays of the right knee, which showed a normal medial and lateral joint space. He concluded that the left knee replacement appeared to be doing satisfactory. The Plaintiff was experiencing diffuse disabling symptoms from relatively mild documented arthritis problems, and he encouraged her to be as active as possible. Id.

Finally, the ALJ discussed the treatment notes of Dr. Alghadban, who examined the Plaintiff's upper

---

[12] The Plaintiff criticizes the ALJ for including medical records from Dr. Blaha and Dr. Waxman that summarized treatment provided prior to the Plaintiff's alleged onset date. (Pl.'s Mem. 11) These summaries appear to be included as background to Dr. Waxman's September 11, 2006, evaluation, which occurred after the alleged onset date.

extremities.  Dr. Alghadban found that an EMG/nerve conduction study was normal; a Doppler ultrasonic study showed satisfactory arterial blood flow; a physical examination found that the Plaintiff had 5/5 motor strength in all four extremities, normal muscle tone and bulk, normal and symmetrical reflexes, and normal coordination and gait; and a sensory examination was intact for pinprick, touch, and vibration.  (R. at 12-13)  Dr. Alghadban diagnosed her with tendonitis, mostly at the elbow level, and recommended she take Motrin two times a day for pain and avoid cold weather.  (R. at 13)  The ALJ's specific reference to the evidence above shows that he weighed Dr. Onishi's opinion along with all of the other evidence, but ultimately found that more weight should be assigned to the opinions of the state agency consultants and the opinions of medical specialists that examined the Plaintiff, such as Drs. Kafka, Waxman, and Alghadban.  The fact that the ALJ did not go through all 88 pages of Dr. Onishi's treatment notes in his decision, and did not explicitly mention each of the factors listed in the regulations, does not mean that the ALJ failed to properly weight Dr. Onishi's opinion, or failed to consider the length and extent of Dr. Onishi's treatment relationship with the Plaintiff.  In summary, the undersigned Magistrate Judge finds that the ALJ supported his decision to reject the opinion of Dr. Onishi with substantial evidence because he identified the weight given to the opinion, provided the reasons for that weight, and cited specific medical evidence from the record that supports his decision.

E.  **Substantial Evidence Supports The Weight Assigned By The ALJ To The Plaintiff's Subjective Complaints Of Pain Because Those Complaints Are Inconsistent With Medical Evidence Of Record And The Plaintiff's Daily Activities**

As her third assignment of error, the Plaintiff argues that the ALJ failed to follow the law in

determining the credibility of the Plaintiff's subjective complaints of pain. (Pl.'s Mem. in Supp. of Mot. for Summ. J. 12-14, ECF No. 9) The Defendant, in turn, argues that the ALJ properly evaluated the Plaintiff's credibility and rejected her subjective complaints based on medical evidence and the Plaintiff's daily activities. (Def.'s Mem. in Supp. of Mot. for Summ. J. 15-16, ECF No. 11) The undersigned Magistrate Judge finds that the Defendant is correct.

The determination of whether a person is disabled by pain or other symptoms is a two step process. Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996); see also 20 C.F.R. § 1529(c)(1); SSR 96-7p, 1996 WL 374186 (July 2, 1996). First, the ALJ must expressly consider whether the claimant has demonstrated by objective medial evidence an impairment capable of causing the degree and type of pain alleged. Craig, 76 F.3d at 594. Second, once this threshold determination has been made, the ALJ must consider the credibility of her subjective allegations of pain in light of the entire record. Id. Social Security Ruling 96-7p sets out some of the factors used to assess the credibility of an individual's subjective allegations of pain, including:

1.  The individual's daily activities;

2.  The location, duration, frequency, and intensity of the individual's pain or other symptoms;

3.  Factors that precipitate and aggravate the symptoms;

4.  The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5.  Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6.  Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7.  Any other factors concerning the individual's functional limitations and

> restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996). The determination or decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996).

Neither the Plaintiff nor the Defendant dispute the ALJ's determination that "the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms," characterized by the Plaintiff as instability in her knee joints and pain in her back, hips, knees, and hand. (R. at 10-11) However, the Plaintiff is incorrect in asserting that the ALJ rejected the Plaintiff's subjective allegations of pain solely on the basis that her complaints are inconsistent with the objective medical evidence. In fact, the ALJ explicitly mentioned evidence pertaining to six of the seven factors. The ALJ discussed the Plaintiff's daily activities:

> She reported that she does cook but no big meals; does small loads of laundry; does light dusting; and goes shopping. She also reported that she helps her daughter with homework goes to her daughter's sporting events; and goes to church services on Sunday that last for one and one-half hours but she sits in a special place with cushions and pillows. She also stated that she goes to parent teacher (PTO) meetings.

(R. at 11) He discussed the location, duration, frequency, and intensity of her symptoms:

> The claimant reports that she has knee pain every time she walks as well as constant low back pain. She stated that the left leg will just collapse at any time. She stated that this happened approximately one year earlier and she fell on the side of her hand and elbow. She had no broken bones but did have significant swelling. She reported that since this fall she experienced pain and swelling and lately her hand had turned black. The claimant reported that she would rate her pain at 6-7/10 most of the time. This pain is in the back, hips, knees and hand . . . .

(R. at 10) He discussed factors that aggravate her symptoms:

if she tried to do too much, it [her pain] gets worse. . . . She reported that she could stand three to four minutes and then needs to shift weight or move around. She reported that bending forward causes severe pain in the low back and hip area. . . . She stated that she could lift less than ten pounds but lifting over her head results in elbow pain. The claimant stated that she cannot squat. The claimant reported that sitting for 30 minutes is painful. She reported that the effects from Demerol, her pain medication results in drowsiness, memory problems, and concentration problems. She stated that she gets anxious around crowds.

(R. at 10-11) He reported that the Plaintiff takes Demerol for pain. (R. at 11) He mentioned some treatments used to relieve the Plaintiff's stability issues, such as a cane for walking and a hand splint for picking things up. (R. at 10-11) Finally, he mentioned that the Plaintiff "sits in a special place with cushions and pillows" when she attends church. (R. at 11) The ALJ then listed medical evidence which is inconsistent with the Plaintiff's subjective complaints:

• Dr. Kafka found severe crepitus in the right knee, but no symptoms in the left knee;

• X-rays of the right knee taken on October 7, 2005, showed only minor degenerative changes;

• An MRI on October 7, 2005, showed evidence of a tear in the anterior horn of the lateral meniscus, but otherwise the menisci were intact;

• An MRI of the claimant's spine showed only mild disc bulges, no significant stenosis, and no evidence of focal herniations;

• A lower extremity ultrasound on March 26, 2004, showed low probability for deep venous thrombosis;

• An EMG/nerve conduction study performed on March 3, 2008, was normal, with no evidence of neuropathy, carpal tunnel syndrome, or radiculopathy in the upper extremities.

(R. at 11)

Based on all of the above information, the ALJ determined that the evidence does not support her subjective complaints, including "the claimant's reported activities of daily living." (R. at 11) Furthermore, the ALJ noted that "[a]lthough there does appear to be severe limitations resulting rom the claimant's musculoskeletal conditions, these limitations allow the claimant to provide

considerable care for her daughter and to do some household chores.  It does not appear that the claimant would be unable to perform some sedentary work." (R. at 11)  Because the ALJ adequately supported his credibility determination with evidence from the Plaintiff's own testimony, as well as objective findings from the medical records, the undersigned Magistrate Judge finds that substantial evidence supports the ALJ's credibility determination.

## VI.  RECOMMENDATION

For the reasons herein stated, I find that substantial evidence supports the Commissioner's decision denying Plaintiff's application for Disability Insurance Benefits.   Accordingly, I recommend that the Plaintiff's Motion for Summary Judgment (ECF No. 8) be **DENIED**, Defendant's Motion for Summary Judgment (ECF No. 10) be **GRANTED**, and the Decision of the Administrative Law Judge be **AFFIRMED** because:

1.    Dr. Onishi's opinion was not entitled to controlling weight;

2.    Substantial evidence supports the weight afforded by the ALJ to Dr. Onishi's medical opinion; and

3.    Substantial evidence supports the ALJ's determination that Plaintiff's subjective allegations of disabling pain were not credible; and

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection.  A copy of such objections should also be submitted to the Honorable Frederick P. Stamp, Jr., United States District Judge.  Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and

Recommendation. 28 U.S.C. § 636(b)(1); <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>Wright v. Collins</u>, 766 F.2d 841 (4th Cir. 1985); <u>United States v Schronce</u>, 727 F.2d 91 (4th Cir. 1984), <u>cert.</u> denied, 467 U.S. 1208 (1984).

The Court directs the Clerk of the Court to provide a copy of this Report and Recommendation to all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Respectfully submitted this **16th** day of **February**, **2011**.

DAVID J. JOEL
UNITED STATES MAGISTRATE JUDGE